# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  July 11, 2025

Ms. Stephanie Lachman Golden
10521 Judicial Drive
Suite 305
Fairfax, VA 22030-0000

Mr. Adam C. Jed
U.S. Department of Justice
Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Lawrence D. Rosenberg
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001

Re:  Case No. 24-2025, *Veltor Underground, LLC v. SBA, et al*
Originating Case No. : 2:23-cv-11183

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0185p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

VELTOR UNDERGROUND, LLC,

      *Plaintiff-Appellant*,

  v.

U.S. SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, Administrator of U.S. Small Business Administration; SCOTT BESSENT, Secretary of U.S. Department of Treasury,

      *Defendants-Appellees*.

> No. 24-2025

———————————

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:23-cv-11183—Jonathan J.C. Grey, District Judge.

Argued:  June 12, 2025

Decided and Filed:  July 11, 2025

Before:  SUTTON, Chief Judge; GIBBONS and WHITE, Circuit Judges.

———————————

### COUNSEL

**ARGUED:**  Lawrence D. Rosenberg, JONES DAY, Washington, D.C., Stephanie Golden, WEST VIRGINIA UNIVERSITY, Morgantown, West Virginia, for Appellant.  Adam C. Jed, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:**  Lawrence D. Rosenberg, JONES DAY, Washington, D.C., for Appellant.  Adam C. Jed, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

     SUTTON, C.J., delivered the opinion of the court in which GIBBONS and WHITE, JJ., concurred.  WHITE, J. (pp. 17–20), delivered a separate concurring opinion.

———————————

## OPINION

———————————

SUTTON, Chief Judge.   In the early weeks of the COVID-19 pandemic, Congress created the Paycheck Protection Program to keep American workers employed.  The program promised forgivable loans to small businesses that maintained their payrolls during the crisis.  One such business, Veltor Underground LLC, claimed that it had six employees when it applied for and received a $125,000 loan.  But the Small Business Administration declined to forgive the loan when it discovered that Veltor's six employees were in fact independent contractors.  Veltor sued.  The district court sided with the government.  Because Veltor's payments to independent contractors do not qualify as "payroll costs" under the statute, we affirm.

I.

Veltor is a construction business located in the suburbs of Detroit.  The record reveals little about its operations beyond the fact that it focuses on "[u]nderground [d]rilling."  R.20 at 69.  What we do know is that, at least as of the start of 2020, it was a success.  It earned $4.8 million in revenue the previous year and delivered a profit of $400,000 to its sole member, Daniel Pator.

Then came March 2020, and a global pandemic.  We do not know how the pandemic affected Veltor.  But we do know that it took a toll on many small businesses, more than half of which laid off workers or cut their hours.  U.S. Census Bureau, Small Business Pulse Survey, fig. 3 (2022), *available at* https://portal.census.gov/pulse/data.

The National Government responded.  By the end of the month, Congress passed, and the President signed into law, the Coronavirus Aid, Relief, and Economic Security Act, better known as the CARES Act, a $2.2-trillion boost to the American economy.  Pub. L. No. 116-136, 134 Stat. 281 (2020).  Of that sum, $349 billion (later increased to $813 billion) was devoted to the Act's Paycheck Protection Program, which promised forgivable loans to small businesses that pledged to maintain their payrolls over the next several months.  *Id.* §§ 1101–1102, 1106, 134 Stat. at 286–94, 297–301 (codified as amended at 15 U.S.C. §§ 636(a), 636m).  The program

promised the same loans to sole proprietors and independent contractors, again to ensure they could maintain their income streams despite the pandemic. *Id.* The Act's loans, however, did not come directly from the federal government. *Id.* Private lenders offered the loans, and the Small Business Administration guaranteed them. *Id.* § 1102, 134 Stat. at 290 (codified at 15 U.S.C. § 636(a)).

One such private lender was Bank of America, and one such borrower was Veltor. Veltor applied for a loan a week after the Act's passage through a form created by the Small Business Administration to determine borrowers' "eligibility" for the program. Interim Final Rule for the Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,812 (2020). The form required Veltor to state the "[n]umber of employees" on staff and calculate its "[a]verage monthly payroll," capped at $8,333 per employee. R.20 at 58–60. Veltor said it had six employees and calculated its monthly payroll as $50,000, the maximum amount a business with six employees could claim. These answers qualified Veltor for a $125,000 loan—2.5 times its average monthly payroll—at a one-percent interest rate. Veltor accepted the funds and with them the loan conditions. It acknowledged that the loan would be forgiven only if it spent at least 75% of the funds on "payroll costs." R.20 at 61.

When Veltor sought forgiveness in 2021, it tried to show that it had done just that. It told Bank of America that it had spent all $125,000 "on [p]ayroll [c]osts" for its (now five) "employees." R.20 at 166. When the bank reviewed Veltor's records, it realized that Veltor paid independent contractors, not employees. The bank denied Veltor's application for loan forgiveness, as did the Small Business Administration. The agency told Veltor that payments made "via 1099's"—that is, to independent contractors—do not qualify as "payroll cost[s]" under the Act, making Veltor "ineligible" for forgiveness. R.20 at 42. Veltor fared no better with the Small Business Administration's internal appeal process.

Veltor sued the Small Business Administration (and a few individuals) in federal court. The district court granted summary judgment for the defendants. Veltor appeals.

II.

At issue is the CARES Act's definition of "payroll costs," the key criterion for determining the size of a borrower's loan and for gauging how much of it the lender and government would forgive.  Here is how the Act defines "payroll costs" in relevant, if lengthy, part:

> (viii) the term "payroll costs"—
>
>> (I) means—
>>
>>> (aa) the sum of payments of any compensation with respect to employees that is a—
>>>
>>>> (AA) salary, wage, commission, or similar compensation;
>>>>
>>>> (BB) payment of cash tip or equivalent;
>>>>
>>>> (CC) payment for vacation, parental, family, medical, or sick leave;
>>>>
>>>> (DD) allowance for dismissal or separation;
>>>>
>>>> (EE) payment required for the provisions of group health care or group life, disability, vision, or dental insurance benefits, including insurance premiums;
>>>>
>>>> (FF) payment of any retirement benefit; or
>>>>
>>>> (GG) payment of State or local tax assessed on the compensation of employees; and
>>>
>>> (bb) the sum of payments of any compensation to or income of a sole proprietor or independent contractor that is a wage, commission, income, net earnings from self-employment, or similar compensation and that is in an amount that is not more than $100,000 on an annualized basis, as prorated for the [applicable] period.

15 U.S.C. § 636(a)(36)(A).

The first type of payroll cost, (aa), addresses "payments of any compensation" to "employees," while the second, (bb), addresses "payments of any compensation to or income of a sole proprietor or independent contractor that is a wage, commission, income, net earnings

from self-employment, or similar compensation." At this stage in the case, Veltor acknowledges that its loan did not go to "employees" but only to "independent contractors." That prompts this question: Does subsection (bb) allow only self-employed individuals—sole proprietors and independent contractors—to apply for a loan based on what they pay themselves? Or does it also allow businesses that pay them to count those payments as part of their "payroll" when they apply for a loan?

Text, context, and structure point to the former—that subsection (bb) allows sole proprietors and independent contractors to get a loan based on their own earnings, the closest thing to a "payroll" they have, and does not allow other businesses to bolster their own loans based on how much they happen to pay self-employed individuals.

*Text.* Start with subsection (bb)'s text. It applies only to "payments" of "compensation" that are "a wage, commission, income, net earnings from self-employment, or similar compensation." The terms naturally describe the money sole proprietors and independent contractors obtain from (or reinvest into) their businesses. A sole proprietor, by definition, runs his own unincorporated business, and may sell goods or services. Black's Law Dictionary 1677 (11th ed. 2019); *see also McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985). An independent contractor, by contrast, sells only services, whether as a sole proprietor or through one corporate form or another (a limited liability company, a partnership, and so on). 1 Steven C. Alberty, Advising Small Businesses §§ 2:2–:10 (2024). No matter their structure, independent contractors remain "small businessmen." *United States v. Silk*, 331 U.S. 704, 719 (1947).

"Income" and "net earnings from self-employment" refer to what a business makes—the funds earned by the business on the one hand and those withdrawn for personal use on the other. "Income" refers to the former, the economic "gain" an entity has derived from its "labor, business, or property" over a given period. Webster's Dictionary 1258 (2d ed. 1959) (def. 4a). "Net earnings from self-employment" account for the latter. A person's "net earnings from self-employment" reflect however much he has made "from [his] trade or business" over the course of a given year. 26 U.S.C. § 1402(a); *see also* 20 C.F.R. § 404.1080(a)–(b). In some cases, that

will be the business's full income, taken out at one time. In others, that will be some of what the business has earned, paid out on a piecemeal basis.

"Wage" and "commission" describe more periodic payments. A "wage" is pay received by a person "for labor," typically per hour, Webster's Dictionary, *supra*, at 2863 (def. 1a), and a commission "[t]he percentage or allowance made" to a person for "transacting" particular items of "business," *id.* at 538 (def. 8). Either one can describe what an owner pays himself from his business's funds.

Viewing "wage" and "commission" to describe self-payments makes good sense in light of their association with "income" and "net earnings from self-employment." When Congress conjoins four nouns in a list, they "should be given related meanings." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012) (quotation omitted); *see also United States v. Williams*, 553 U.S. 285, 294 (2008). The common denominator is that each one describes what a sole proprietor or independent contractor receives, whether as part of his business's balance sheet or as his own personal compensation. Together they capture the full panoply of his earnings.

When a business buys goods from sole proprietors and services from independent contractors, by contrast, it does not pay a wage, commission, income, or net earnings from self-employment. Subsection (bb)'s terms do not fit that bill.

That is clear enough for "income" and "net earnings from self-employment." Only what one gets can be described as "income" or "net earnings from self-employment," not what one gives.

The same holds for "wage" and "commission," too. Those terms, to repeat, refer to payments made to people, not to businesses. But to be a sole proprietor or independent contractor is to be in business for yourself—to be your own boss. Sole proprietors, by definition, own and operate their own businesses. Black's Law Dictionary, *supra*, at 1677. And it is independent contractors' independence that separates them from employees. Restatement (Second) of Agency § 220(2) (Am. L. Inst. 1958). Unlike employees, they "operate their own independent businesses," *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 258–59 (1968), and thus

must rely on their own "initiative, judgment, or foresight" to turn receipts into profits, *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). They may pay themselves a wage or commission from their earnings, but that is not what others pay them.

That accords with common business usage. When businesses compensate sole proprietors and independent contractors, they do not describe those payments internally as wages or commissions (much less income or net earnings from self-employment). Robert Libby et al., *Financial Accounting* 475–78 (11th ed. 2023) (distinguishing "accounts payable," or sums a company owes its vendors for goods and services, from "accrued payroll and benefits," or wages a company owes its employees). When vendors earn those payments, they do not describe them as wages or commissions either. *Id.* at 297–98 (describing "accounts receivable," amounts owed to a business by its trade customers). So too in the tax context, where employers report their employees' "wages" and their contractors' "compensation." *Compare* IRS, Catalog No. 25979S, General Instructions for Forms W-2 and W-3 (2020), *with* IRS, Catalog No. 27982J, Instructions for Forms 1099-MISC and 1099-NEC (2020).

This distinction has a familiar ring in other areas of law. It is one that was recognized long ago in the context of collecting unpaid liabilities. *See* 2 Roswell Shinn, *A Treatise on the American Law of Attachment and Garnishment* § 558(d), at 944 (1896) ("[The term 'wages'] do[es] not extend to what is earned by him as a contractor . . . ."). And it is one still recognized in labor law. As then-Judge Breyer once put it: "Independent contractors undertake to do a job for a price . . . and depend for their income not upon wages [paid by their customers], but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is, upon profits." *NLRB v. Amber Delivery Serv., Inc.*, 651 F.2d 57, 60 (1st Cir. 1981) (quotation omitted).

The distinction makes practical sense, too. If a landscaper, say, is promised $10,000 by a business, part of that sum may eventually serve as his take-home pay, but he must first deduct the expenses incurred to complete the job—project-specific outlays, like plants and soil, and other overhead costs, like insurance. To the extent he earns a wage or a commission, it is a wage or commission he pays himself from what his customers pay him. (It is common, in fact, for sole proprietors to assign themselves an hourly rate out of their earnings. *See, e.g.*, Stephen Fishman,

*Working for Yourself* 147–51 (12th ed. 2021).)  A business no more pays its contractors a wage or a commission when it purchases services than a business's customers pay the business's employees a salary when they purchase goods.

In sum, subsection (bb)'s terms adopt the perspective of a sole proprietor or independent contractor and ask how much he pays himself.  They do not extend to the payments made to sole proprietors and independent contractors by their customers.  Subsection (bb), then, allows sole proprietors and independent contractors to determine their own payroll costs; it does not allow their customers to do so, too.

*Context.*  What the terms of the statute suggest, context confirms.  A number of the Act's provisions show how subsections (aa) and (bb) work in tandem—the former for businesses that pay employees, the latter for sole proprietors and independent contractors who pay themselves.

Notice how the Act defines the universe of borrowers.  To ensure a wide variety of small businesses have access to the program's loans, the Act said that "any business concern" with fewer than "500 employees" may apply.  15 U.S.C. § 636(a)(36)(D)(i)(I).  And to ensure self-employed individuals were not left out, the Act said that "individuals who operate under a sole proprietorship or as an independent contractor" could apply also.  *Id.* § 636(a)(36)(D)(ii)(I).

Subsections (aa) and (bb) reinforce this same division.  They use the same two categories: a business with employees for (aa), and a sole proprietor or independent contractor for (bb).  And they offer a definition of payroll costs for each one.  Subsection (aa) allows a business with employees to look at "the sum of payments of any compensation with respect to [those] employees"—plural.  *Id.* § 636(a)(36)(A)(viii)(aa).  And subsection (bb) allows "a sole proprietor or independent contractor"—singular—to look at "the sum of payments of any compensation or income" to it.  *Id.* § 636(a)(36)(A)(viii)(I)(bb).

Our interpretation honors that division.  The payment universes do not overlap, as subsection (aa) covers businesses applying on their employees' behalf, and subsection (bb) covers a single self-employed individual applying on his own behalf.  Never the twain shall meet.  Otherwise, a business could count not only its payments to employees under subsection (aa) but also its payments to sole proprietors and independent contractors under (bb), meaning

that the Small Business Administration would guarantee the same loan twice—once in the business's accounts payable and once in the vendor's accounts receivable. That's a poor fit for a law with limited funds that elsewhere required applicants to certify that their loan applications were not "duplicative" of other credits. *Id.* § 636(a)(36)(G)(i)(IV), (a)(36)(A)(viii)(II)(dd), (ee).

Notice one of the Act's exclusions, which also supports this interpretation. In defining payroll costs, the Act excludes compensation paid to "employee[s] whose principal place of residence is outside of the United States." *Id.* § 636(a)(36)(A)(viii)(II)(cc). But it does not exclude compensation paid to sole proprietors and independent contractors outside the United States. That makes sense. Because only sole proprietors and independent contractors based in the United States could apply for a loan, *see id.* § 636(a)(36)(A)(v), there was no need to exclude payments made to sole proprietors and independent contractors abroad, as subsection (bb) would not cover those payments. But if subsection (bb) allowed businesses to include their payments to sole proprietors and independent contractors as part of their payroll costs, nothing would stop them from doing so for sole proprietors and independent contractors at home and abroad. That would be odd in a law that expressly excluded payments to employees abroad. And it would be doubly odd in a law that set as its goal "Keeping American Workers Paid and Employed." 134 Stat. at 286.

Notice, too, the Act's loan forgiveness provisions, which likewise cut with this grain. Congress limited businesses' eligibility for forgiveness if they fired any of their employees, 15 U.S.C. § 636m(d)(2)(A), or cut their wages by more than 25 percent, *id.* § 636m(d)(3)(A). But it did not do so for businesses that ended their contracts with sole proprietors and independent contractors. That, again, makes sense. The Act needed to police payments made under subsection (aa), or a business could take out a loan for its five employees and pocket the money without paying them a cent (or nickel). But it had no need to police payments under subsection (bb). Subsection (bb) covers only what a sole proprietor or independent contractor pays himself, so Congress had little need to worry that he would get a loan and then diminish his own wages. That explanation would make little sense, however, if subsection (bb) also covered a business's payments to the sole proprietors and independent contractors with whom it happened to contract. Without any limitation on forgiveness in place, a business could count its

payments to vendors to get loan funds but then cut off those same vendors with impunity. That loophole is nowhere in the Act.

Text and context thus resolve this case. Veltor had no employees, leaving it no expenses to claim under subsection (aa). And Veltor is not a sole proprietorship, and does not argue that it is an independent contractor, leaving it no expenses to claim under subsection (bb). Without paychecks to protect, Veltor was not entitled to have its loan forgiven. It must repay the loan.

### III.

Veltor urges a different reading of subsection (bb), one in which a business's payments to its vendors count as part of its "payroll costs."

It starts with text but not the whole text. Even if "income" and "net earnings" may not be read to include payments made by businesses to their vendors, Veltor insists, "wage" and "commission" may be. In its view, we should define those terms more broadly, effectively to include any payment "for work or services." Reply Br. 11 (quoting *Wage*, Collins English Dictionary, *available at* https://collinsdictionary.com/us/dictionary/english/wage). To limit "wage" and "commission" to what businesses pay their employees for purposes of (aa), and to what self-employed individuals pay themselves for purposes of (bb), it argues, would artificially narrow the statute.

This argument starts off on the wrong foot. It assumes that we should analyze each word of subsection (bb) in the abstract, no matter its neighbors. But it is a mistake to accept "the broadest imaginable definition[]" of each of a list's "component words" and leave it at that. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (quotation omitted); *see also Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Even a Latin phrase tells us so. "Noscitur a sociis," or "it is known by its associates," is shorthand for the commonsense proposition that words are known by the company they keep. Scalia & Garner, *supra*, at 195 (quotation omitted). But we need not resort to legalese (or even common sense), as the statute instructs us to interpret these terms together. It uses a catchall term, "similar compensation," to refer back to the full list of "wage," "commission," "income," and "net earnings from self-employment." 15 U.S.C. § 636(a)(36)(A)(viii)(I)(bb). We must take the Act at its word that these terms "have some

quality in common," such that "similar compensation" makes sense. Scalia & Garner, *supra*, at 196.

That quality is one we have already described. Each word can sensibly be read to refer to amounts earned by sole proprietors and independent contractors. For those who are self-employed, their "income" and "compensation" are two sides of the same coin. Their "income" is the economic "gain" their businesses have derived over a given period, Webster's Dictionary, *supra*, at 1258 (def. 4a), while their "compensation" is, more narrowly, what they have received from the business as "remuneration," *id.* at 545 (def. 2)—sometimes in the form of a commission (especially if per sale or service), *see id.* at 538 (def. 8), other times in the form of a wage (especially if per hour), *see id.* at 2863 (def. 1a). They all fit together rather than fall apart. Each one reflects how someone who is self-employed might describe his (or his business's) earnings.

Veltor's interpretation does the opposite. On its view, subsection (bb)'s terms would be wholly unalike. The first two terms, "wage" and "commission," would look to the *customer's* perspective, while the latter two, "income" and "net earnings from self-employment," would look to the *vendor's*. "In some circumstances," it is true, "it may be difficult to discern what a statute's specific listed items share in common." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 218 (2024). But where there is "an obvious link," judges should accept the gift before them. *Id.*

It's not that easy, Veltor counters. Isn't it odd that subsection (bb) would refer "exclusively to payments to oneself," as if one were one's own employer? Appellant's Br. 5. That common link, Veltor suggests, is not one that most people would consider to be common at all. We do not find it so odd. A number of federal statutes treat a sole proprietor as if he were "his own employer." 26 U.S.C. § 401(c)(4) (Internal Revenue Code); *see also, e.g.*, 29 U.S.C. § 1301(b)(1) (ERISA). These laws "expressly anticipate that a working owner can wear two hats," and sometimes must. *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 16 (2004). It is not uncommon that a closely held business entity would pay its owner some regular compensation, and indeed some corporations must do so. *See Exacto Spring Corp. v. Comm'r*, 196 F.3d 833, 837–38 (7th Cir. 1999). If Congress's aim was to allow self-employed individuals to protect their own paychecks, it made good sense to include all the forms in which

they may receive compensation, both in terms of their business's income and their personal remuneration.

What about the reality, Veltor worries, that subsections (aa) and (bb) are connected through the conjunctive, "and," rather than the disjunctive, "or"? In Veltor's view, the only reason Congress would use "and" rather than "or" is because it intended both (aa) and (bb) to be used by most borrowers. "And" does not do that much work. "[I]n grammatical terms," the term "and" "is of course a conjunction—a word whose function is to connect specified items." *Pulsifer v. United States*, 601 U.S. 124, 133 (2024). As a conjunction, the term combines the two parts of the definition, it is true. But conjunctive of what? The word "and" does not tell us what each conjoined part means. For that, the reader has to look at the other terms. Put another way, the fact that the definition includes both (aa) and (bb) does not tell us whether (bb) refers to payments a business makes to sole proprietors and independent contractors or to payments that sole proprietors and independent contractors make to themselves. It is the other words in subsection (bb) that do that.

Veltor turns to context and structure. It contends that our interpretation ignores half of subsection (bb). The subsection, to repeat, includes "payments of any compensation to *or* income of a[n] . . . independent contractor." 15 U.S.C. § 636(a)(36)(A)(viii)(I)(bb) (emphasis added). In Veltor's view, our interpretation leaves no work for the former phrase— "compensation to . . . a[n] . . . independent contractor"—to do. "[H]ad Congress intended to provide subsection (bb) as a way of calculating [the internal] payroll costs [of] independent contractors or sole proprietors only," Veltor says, "there is no reason it could not have simply omitted 'compensation to,'" leaving only "income of." Appellant's Br. 27. Not so. We have already given one reason why Congress may have paired "compensation to" with "income of." They provide different ways of looking at a self-employed person's earnings. In emergency legislation designed to function at "warp speed," *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1262 (11th Cir. 2020), it made sense for Congress to give sole proprietors and independent contractors a few different ways to count their own wages. *Cf. Pugin v. Garland*, 599 U.S. 600, 609 (2023) ("some overlap" between terms in a list is "common in statutory

drafting," and often reflects "a congressional effort to be doubly sure" (quotation omitted)). That creates less superfluity and more common sense.

There is at least one other reason Congress would have included both phrases. Under the CARES Act, a business must not only *have* payroll costs to get a loan, but it also must *use* the funds on payroll costs to get its loan forgiven. 15 U.S.C. § 636m(d)(8). "Income of" and "compensation to" plausibly play different roles in this respect. "Income of" allows a self-employed individual to look at how much his business has earned over the past twelve months when he first wishes to qualify for a loan. (Hence he may count his profits toward his "payroll costs," even if he chose to reinvest those funds in the business rather than withdraw them for personal use.) "Compensation to" allows a self-employed individual to use loan funds in particular ways when he wishes to qualify for loan forgiveness—most obviously, to pay himself a "wage." Our interpretation gives content to both phrases and to the statute as a whole.

Veltor argues that a different provision of the statute offers a contextual clue in favor of its position. Under the Act, lenders were required to consider "whether the [putative] borrower . . . paid independent contractors, as reported on a Form 1099-MISC." 15 U.S.C. § 636(a)(36)(F)(ii)(II)(bb). That provision would make "no sense," Veltor says, if the Act's loans "could not be used to cover payments to independent contractors." Appellant's Br. 28. But this overstates the role of the provision. It appears in a subclause that sought to ensure that loan applicants were ongoing concerns that predated the COVID-19 crisis. The subclause establishes two rough proxies for eligibility—that the business was in existence before the COVID-19 crisis began, and that it engaged in bona fide economic activity. The provision accomplished the first goal by ensuring that the loan applicant was "in operation on February 15, 2020," just over a month before Congress passed the Act. 15 U.S.C. § 636(a)(36)(F)(ii)(II)(aa). It accomplished the second goal by ensuring that the business was real, which Congress sensibly determined could be established in one of two objectively provable ways: by having "employees for whom the borrower paid salaries and payroll taxes" or by having "paid independent contractors, as reported on a Form 1099–MISC," *id.* § 636(a)(36)(F)(ii)(II)(bb). That allowed the government to sort the wheat (real businesses, in need of support) from the chaff (fake businesses, established solely to capitalize on the program). And that required the government to

focus on "evaluating the eligibility of a borrower" for a loan. *Id.* § 636(a)(36)(F)(ii)(II)(aa). The provision simply does not address how payroll costs are determined.

Veltor suggests that one of the contextual problems we identify with its interpretation, the possibility of duplicative payments, is more hypothetical than real. Because subsection (bb) uses "or" when it describes the "payments of any compensation to or income of" a sole proprietor or independent contractor, Veltor explains, only one party—either the entity that paid the compensation or the entity that received it as income—could claim a particular payment. *Id.* § 636(a)(36)(A)(viii)(I)(bb). And because the statute elsewhere requires "a good faith certification" from the recipient that its loan is not "duplicative of" another loan, double dipping is doubly forbidden. *Id.* § 636(a)(36)(G)(i)(III).

Count us skeptical. Subsection (bb) does not look at each payment in the abstract. It instead asks for a tally: the "sum of payments." *Id.* § 636(a)(36)(A)(viii)(I)(bb). As a textual matter, it is unclear where Veltor gets the idea that each individual payment ought to be assigned to the payor or the payee. The certification provision does not help either. That provision requires the "*recipient*" to certify that *it* "does not have an application pending for a loan" under the Act that would be "duplicative of amounts applied for or received under a covered loan." *Id.* § 636(a)(36)(G)(i)(III) (emphasis added). It does not require the recipient to ensure that no one else has applied for funds that might cover the same expenses.

Even if Veltor's view were textually permissible, we do not see how it could possibly have worked in practice. It would have required businesses and vendors to investigate each other's loan applications in a program designed to operate in a national emergency, with no statutory guidance as to who should prevail if both sought to claim the same payment—and who should prevail if both received funds and subsequently sought forgiveness. Should it be the first who applied? The first who received funds? Or some other rule? Veltor does not say, and neither does the Act.

Veltor pins the blame on the Small Business Administration, which (Veltor says) could have resolved this issue through canny use of its emergency rulemaking authority. *Id.* § 9012. But we read the statute as Congress wrote it, not as the agency might rewrite it. That Veltor

assumes deus-ex-machina intervention from the agency to make the Act workable suggests that it misreads the Act's design.

Veltor turns last of all to policy and legislative history. It argues that Congress prioritized speed over precision, even at the risk of some duplicative loans. "Congress's objective of getting cash out to struggling American businesses," it explains, "predominated any concerns about wasteful spending." Appellant's Br. 41. Perhaps so. But "no law pursues its purposes at all costs." *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023) (quotation omitted). "[I]t frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522 (1987) (per curiam) (emphasis omitted). As Veltor acknowledges, Congress had to balance a number of objectives in the CARES Act. Yes, it wanted to distribute money quickly. But it also wanted to prevent waste and fraud in a program worth hundreds of billions of dollars. It was hardly irrational for Congress to decide that businesses should support their employees and self-employed individuals should support themselves.

Veltor points to a number of post-enactment press releases and website statements from legislators, many of whom said that "[e]ligiblity" for the program "includes self-employed and contracted workers." Reply Br. 24–25 (quoting Rep. Daniel Webster, *Webster Statement on Senate CARES Act* (Mar. 26, 2020), https://webster.house.gov/2020/3/webster-cares-act). But Veltor pushes on an open door. Everyone agrees that the Act helps sole proprietors and independent contractors. The only question is how, whether just through their own loans (the government's position) or also the loans of their customers (Veltor's).

How about the "settled economic expectations" of small businesses, Veltor asks? Many small businesses "are not particularly sophisticated with respect to parsing the nuances of statutory requirements," it notes, so it would be unfair to tell such businesses that they cannot rely on the guidance they are given. Appellant's Br. 41–42. We take the point, but Veltor is not a poster boy for unfair treatment. The reality is that the Small Business Administration created a form to determine potential borrowers' eligibility, which required applicants to state how many employees they had. Veltor said it had six, when it had none. Had it answered the question accurately, this situation would never have occurred. The company may have been confused by

the inquiry, but it was not misled.  Enforcing the Act's terms may lead to some unfairness at the margins, but courts must "observe the conditions defined by Congress for charging the public treasury."  *Fed. Crop Ins. v. Merrill*, 332 U.S. 380, 385 (1947); *see also Heckler v. Cmty. Health Servs. of Crawford County*, 467 U.S. 51, 63 (1984).  That is all we do today.

For these reasons, we affirm.

---

**CONCURRENCE**

---

HELENE N. WHITE, Circuit Judge, concurring.  It is unclear to me what Congress intended with respect to payments to independent contractors.

## I.

## A.

My reservations in agreeing with the government's reading of the CARES Act stem from the Act's eligibility-considerations provision, 15 U.S.C. § 636(a)(36)(F)(ii)(II), which sets out what a lender must consider when evaluating a prospective borrower's loan eligibility.  That provision expressly requires a lender to consider whether the borrower has paid independent contractors—a requirement that seems to be without purpose under the government's reading.  In full, the provision states:

> (II)  Considerations.—In evaluating the eligibility of a borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower—
>
>> (aa)  was in operation on February 15, 2020; and
>>
>> (bb)
>>
>>> (AA)  had employees for whom the borrower paid salaries and payroll taxes; *or*
>>>
>>> (BB)  *paid independent contractors*, as reported on a Form 1099–MISC.

*Id.* (emphasis added).

I agree with the majority that the primary purpose of this provision is to ensure that a prospective borrower is a bona fide business that was in operation before the pandemic affected the national economy and that it had covered payroll costs, as evidenced by the payment of wages verified through payroll taxes paid.  But under the government's interpretation, a prospective borrower that employs only independent contractors and issues only 1099s has no payroll costs and thus is eligible for neither a loan nor loan forgiveness.  Rather, "payroll

No. 24-2025          *Veltor Underground, LLC v. SBA et al.*          Page 18

costs"—the factor that determines both the loan amount and forgiveness—is based on *either* what an employer pays its employees (15 U.S.C. § 636(a)(36)(A)(viii)(I)(aa)) or what an independent contractor or sole proprietor receives as compensation or income (15 U.S.C. § 636(a)(36)(A)(viii)(I)(bb)), but *not* what any borrower pays independent contractors. Thus, whatever a prospective borrower's bona fides, payments to independent contractors are always irrelevant to loan eligibility and forgiveness.[1] Why, then, does the Act require lenders to consider such payments "[i]n evaluating the eligibility of a borrower" for a loan? *Id.* at § 636(a)(36)(F)(ii)(II). Such an inquiry has no purpose if payments to independent contractors are not covered as "payroll costs."

The majority lays out the case for the government's interpretation, under which 15 U.S.C. § 636(a)(36)(A)(viii)(I)(bb) ("subsection bb") applies only to independent contractors, sole proprietors, and eligible self-employed borrowers, all of whom must apply for their own loans. But the subsection could also be read to apply to *both* a business's payments to independent contractors and an independent contractor's or sole proprietor's income that determines its loan amount. Indeed, the subsection states that payroll costs include "any compensation to or income of" an independent contractor. *Id.* Veltor plausibly argues that Congress intended that the statutory phrase "compensation to . . . [an] independent contractor" refer to what a business pays an independent contractor, and that the phrase "income of . . . [an] independent contractor" refer to what the independent contractor receives as compensation or income. *Id.* In this reading, the meaning of the words remains constant, but the context determines how the provision applies to a particular loan.

**B.**

Although interpretating "payroll costs" as including payments to independent contractors is reasonable based on subsection bb's text and especially the text of the eligibility-considerations provision, the majority accurately explains that many other provisions of the statute seem to contemplate that an employer's payroll costs include payments to employees only. Most importantly, the statute includes no penalty for borrowers who include payments to

---

[1]Rather, it would seem that an independent contractor's *receipt* of 1099 payments would be the more relevant factor.

independent contractors in their payroll costs and then fail to make such payments. And when seeking loan forgiveness, an eligible recipient must submit documentation of the number of full-time equivalent employees on payroll, pay rates, payroll-tax filings reported to the IRS, and state income, payroll, and unemployment insurance filings. 15 U.S.C. § 636m(e)(1). But the loan-forgiveness provisions require no documentation that payments were made to independent contractors and make no reference to 1099s, which would confirm such payments. These omissions weigh heavily in favor of the government's interpretation.

Additionally, the SBA made its position on payments to independent contractors clear in its regulations implementing the CARES Act, stating that payments to independent contractors are not "payroll costs." 85 Fed. Reg. at 20,813, 20,814 (§ III(2)(h), (p)). Congress later amended the CARES Act—including the statutory definition of "payroll costs"—but it did not reject the SBA's interpretation. *See* Pub. L. No. 116-260, div. N, § 308(a), 134 Stat. 1182, 2000. This "failure to revise or repeal the agency's interpretation" is "persuasive evidence that the interpretation is the one intended by Congress." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986); *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 159 (2013).

Thus, although I find Congress's intent more uncertain, and Veltor's arguments to have more substance, than does the majority, on balance I ultimately conclude, albeit with reservations, that the statutory text read in its entirety is more consistent with the government's interpretation than with Veltor's. *See also* Op. at 5–11 (discussing CARES Act provisions that support the government's interpretation).

## II.

Finally, I observe that Veltor's assertion that it fell victim to a "bait-and-switch" is not simply the complaint of a borrower who made false assertions and seeks to blame others. R.1 at 3 ¶ 7. To be sure, as the majority observes, the SBA's loan-eligibility form required applicants to state how many employees they had. But Veltor asserts that it stated that it had six employees only after Bank of America—the government's approved lender—"represented to Veltor that independent contractor compensation was *an eligible payroll cost*." R.1 at 3 ¶ 7, 8 ¶ 31. Further, the application form's addendum required Veltor to certify that it "had employees . . . *or paid*

*independent contractors*"—presumably prompted by the statute's eligibility-considerations provision—and that it would use the loan to "retain *workers*"—a term used in the statute's certification provision, 15 U.S.C. § 636(a)(36)(G)(i)(II), that could fairly encompass both employees and independent contractors. R. 20 at 61 (emphases added). And, as discussed above, the statutory text is unclear on this issue. Accordingly, a business in Veltor's position could reasonably have believed when it applied for the loan that it would be forgiven if it continued to pay its independent contractors. But Veltor raises no legal claims based on its allegedly being misled by Bank of America or the SBA.[2] Thus, the only issue here is the proper interpretation of the Act.

\* \* \*

For the reasons stated, I concur, with reservations.

---

[2] Veltor does not, for example, argue that the government should be equitably estopped from denying loan forgiveness, or that the Bank falsely represented the terms of the loan. *Cf. Modern Perfection, LLC v. Bank of America*, No. 22-cv-02103-LKG, 2023 WL 5433006, at \*1 (D.Md. Aug. 22, 2023) (putative class action alleging that Bank of America "falsely represent[ed] . . . that payments to independent contractors were qualifying payroll costs under the PPP and that these payments would be forgiven").

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-2025

VELTOR UNDERGROUND, LLC,

    Plaintiff - Appellant,

    v.

U.S. SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, Administrator of U.S. Small Business Administration; SCOTT BESSENT, Secretary of U.S. Department of Treasury,

    Defendants - Appellees.

```
┌──────────────────────────────┐
│            FILED             │
│         Jul 11, 2025         │
│   KELLY L. STEPHENS, Clerk   │
└──────────────────────────────┘
```

Before: SUTTON, Chief Judge; GIBBONS and WHITE, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_Kelly L. Stephens_

Kelly L. Stephens, Clerk